## Monson v. Commonwealth.

Feb. 13, 1942.

J. P. Chenault for appellant.

Hubert Meredith, Attorney General, and W. Owen Keller, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

An indictment was returned by the grand jury of Madison County on February 5, 1941, accusing appellant, C. A. Monson, of the commission of the crime of murder by shooting and killing with the necessary intent, Luther Whittamore. Under a plea of not guilty his trial was later had, resulting in his conviction of voluntary manslaughter, with an attached punishment of seven years' confinement in the state penitentiary. His motion for a new trial was overruled and from that order and the judgment pronounced on the verdict he prosecutes this appeal. The only two grounds contained in the motion for a new trial are: (1) That the evidence heard at the trial was insufficient to sustain the conviction, and (2), error of the court in the admission and rejection of testimony. However, in brief of appellant's counsel filed in this court no reference whatever is made to ground (2), and which, under well settled practice, may be treated as an abandonment of it, even if the record contained any foundation for urging it, but which in this case is absolutely untrue. We will, therefore, devote this opinion entirely to a consideration of ground (1).

In his endeavor to induce us to sustain ground (1) counsel cite a number of cases—some of which are recent and others of much longer standing—wherein we held that the evidence did not authorize a conviction of the accused, although the commission of the act for which he was indicted was admitted by him, but that the facts constituting his defense were conclusively proven so as to entitle him to an acquittal. Those cases—it might be said once and for all—were where neither the express testimony heard at the trial, nor any convincing circumstantial facts contradicted the defense interposed and left its establishment entirely or overwhelmingly unassailed by counter testimony. It remains to be seen whether this case comes within that category.

The killing occurred, on January 29, 1941, near mid-

night at defendant's place of business located in the outskirts of the city of Richmond, to which he applied the delectable name of "Rainbow Gardens," but at which uplifting influences were conspicuously absent. The attendants thereat entertained themselves by drinking and dancing, the character of the latter of which is most generally not conducted at such establishments upon the high plane of elegance and decency. Nevertheless appellant voluntarily chose to embark therein and in doing so invited the surroundings and condition that might be produced by its maintenance, which presumptively was done solely in consideration of the revenue that might be derived therefrom. Nevertheless he is entitled to a fair trial under the law, and if the vigorous argument of his counsel that the evidence was insufficient to support the verdict is correct appellant is entitled to an acquittal; otherwise the judgment would have to be affirmed, the determination of which calls for a statement of the substantial facts testified to by the witnesses.

The deceased visited appellant's place of business on the afternoon of the fatal day, but left it before or about nightfall, returning thereafter with some companions in an automobile, and remained there until appellant shot and killed him. He was drinking to a considerable extent and his conduct toward others in attendance made his presence more or less a nuisance, but none of it consisted of harmful acts or quarrelsome conduct on his part, but only in interrupting the dancers, and more or less familiarity with some of the female attendants. His intoxication produced an inclination on the part of the female attendants to decline dancing with him upon his request, although some of them did accommodate him in that regard in spite of his intoxication. Such conduct on his part appears to have been indulged in good-humoredly, but which nevertheless did not allay its annoying effects. A companion who came there with him on his second visit took him on the outside of the room, but he soon returned and continued his annoying conduct as he had done theretofore. Appellant then approached him with the determination of again forcing his exit from the premises, during which they engaged in some sort of affray, when appellant struck deceased in the mouth with his fist, and followed it up by forcefully expelling deceased from the house and shutting the door.

Shortly thereafter appellant testified that he looked

through the door—or rather the glass portion of it—and saw the deceased again returning towards the establishment apparently intending to re-enter it; whereupon appellant went behind the counter to a desk and procured a pistol and then went to the door, which deceased was approaching, and opened it. The music (of whatever grade or quality it was) was then being produced and dancing was in operation. Therefore no one heard exactly what was said between appellant and the deceased immediately before the shooting. However, appellant stated that when he opened the door after procuring his pistol deceased was approaching it with a knife in his hand and threatened to kill him. His request for deceased to desist was unheeded and when the latter got within a few feet of appellant he fired his pistol, resulting in the infliction of the instantly fatal wound.

On his return into the building—and among the reduced crowd then remaining therein (the others having immediately departed therefrom upon the firing of the shot)—he remarked in the hearing of those present, to "Pick up that knife." One of the dancing females who appeared to be extremely biased towards appellant also testified that as she and her partner were making a twirl close to the door she looked out and saw from that distance and in her then circumstances, a knife lying by the side of the deceased, whose body was some six or more feet from the door leading to the outside of the building. Appellant had a partner in the business he was conducting by the name of Million, who was present behind the counter waiting on customers on the fatal occasion, and after the shot was fired he and one of the attendants, Sherman Waldon, went to the body where it was lying on the outside, and they, according to the testimony, were the first ones there. Million claims to have picked up a small pocket knife lying somewhere close to the body of deceased, but Waldon in his testimony contradicted Million as to the finding of a knife where the latter claimed to have found it, or elsewhere. Million testified that the knife was open and he closed it and put it in his pocket and kept it for several days without mentioning the fact to anyone whomsoever, in the face of the fact that there was considerable commotion produced at the time, and more or less interest manifested as to the circumstances under which the fatal wound was inflicted. The widow of the deceased testified that the knife claimed to have been picked up by Million (and which was exhibited at

the trial) was not her husband's knife, but that the only one he owned was an old, more or less dilapidated Barlow.

It will be noted that the sole defense interposed in this case, is, that appellant shot and killed deceased in the exercise of his right of self-defense, which is an admission by him that he was guilty of the homicide, but which was excusable on his part for the reason stated. In the case of Hatfield v. Commonwealth, 264 Ky. 721, 95 S. W. (2d) 562, (and numerous others that could be cited) we held that when the deed constituting the crime was admitted by the accused the burden was on him to prove a legal excuse therefor so as to exonerate him from punishment. Furthermore, the rule is well settled in this and other courts that circumstantial evidence possessing sufficient convincing force may overcome express testimony concerning the principal fact to be established. A late domestic case announcing and approving that principle is Haffler v. McKinney, 288 Ky. 782, 157 S. W. (2d) 92. In the instant case, as we have seen, defendant seeks to excuse the homicide which he admits he committed on the ground that he did the killing in his necessary self-defense; and whether or not that is true is entirely dependent upon the required threatened danger to his life or limb by the deceased. The alleged danger in this case was the approaching of deceased to appellant in a threatening and angered manner, with an open knife in his hand, accompanied with a declaration of his intention and purpose to kill him or inflict on him great bodily danger. If no such danger was produced, then, necessarily, no right of self-defense is available. Therefore, the turning and decisive fact in the case is whether or not deceased, when he was shot by appellant, had a knife in his hand and threatening to use it either fatally to appellant, or the infliction upon him of great bodily harm.

But one witness testified that he did have in his hand at that time a knife, and that witness was defendant, who testified to the threatened unlawful use of the knife as declared by the deceased. No one else heard any of the words that passed between the two at that time, nor did anyone see what was transpiring. The chief witness (Million) who testified about the location of the knife after the fatal shooting occurred was contradicted by a companion who was with him at the time he claims to have seen the knife by the body of the de-

ceased. Others who testified for the prosecution gave testimony more or less convincing of the absence of the alleged knife at the place where that witness claims to have discovered it or elsewhere. The wife of the deceased stated that her husband possessed no such knife, and the conduct of the deceased as described by the appellant upon which his right of self-defense is based, depicts a belligerency on the part of the deceased which he at no time prior thereto had exhibited, either in the afternoon or the night of the fatal day.

Moreover, appellant was more or less angered at the deceased on account of the latter's conduct, as is shown by what transpired at the time defendant ejected him from the premises a short while before the shooting, and which was no doubt kept alive or re-established when he discovered that deceased had determined to not remain ejected from the building, but to return to it. Upon discovering that fact he armed himself with his pistol and immediately went to the front door of his building to prevent the deceased from re-entering it. Nothing had happened to create the belief that he needed his pistol in fulfilling his purpose to prevent the maudlin deceased from re-entering the building—all of which furnishes a strong inference that appellant had determined in his mind to prevent any such re-entry absolutely and regardless of consequences. At any rate, the testimony in the record can be said to produce no more nor less than a contrariety of proof, furnished by both express and circumstantial evidence upon the crucial and decisive issue, supra, i. e., whether or not the deceased in the manner indicated placed appellant in such danger as that he was justified in killing him in the exercise of his right of self-defense in order to avert that danger. The jury necessarily found that the homicide did not occur in circumstances making available the right so as to excuse appellant, and we are far from agreeing with counsel that the testimony supporting that theory of the prosecution was insufficient to uphold the verdict of guilty, which necessarily rejected it.

Wherefore, the judgment is affirmed.